# United States Court of Appeals for the Federal Circuit

---

**JILLIAN LESKO,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1823

---

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00715-CNL, Judge Carolyn N. Lerner.

---

Decided: December 12, 2025

---

DIMITRIOS VASILIOU KOROVILAS, Wucetich & Korovilas LLP, El Segundo, CA, argued for plaintiff-appellant. Also represented by JASON MATTHEW WUCETICH; MICHAEL S. MORRISON, Alexander Morrison & Fehr LLP, Los Angeles, CA.

MATTHEW JUDE CARHART, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by REGINALD THOMAS BLADES, JR., PATRICIA M. MCCARTHY, BRETT SHUMATE.

---

Before MOORE, *Chief Judge*, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.[1]

Opinion for the court filed by *Chief Judge* MOORE, in which *Circuit Judges* LOURIE, DYK, PROST, TARANTO, CHEN, and HUGHES join.

Dissenting Opinion filed by *Circuit Judge* STOLL, in which *Circuit Judges* REYNA, CUNNINGHAM, and STARK join.

MOORE, *Chief Judge*.

Jillian Lesko appeals a decision of the Court of Federal Claims dismissing all five counts in her Amended Complaint for failure to state a claim. We granted en banc review sua sponte to address a narrow issue concerning Count II—is the overtime writing requirement in 5 C.F.R. § 550.111(c) a valid exercise of the Office of Personnel Management's (OPM) rulemaking authority in light of the statutory requirement in 5 U.S.C. § 5542(a) that the Government pay overtime "officially ordered or approved"? We conclude the writing requirement is valid and affirm the Court of Federal Claims' dismissal of Count II. We refer the remainder of the appeal back to the panel for resolution.

## BACKGROUND

### I. Legal Background

In relevant part, the statute and regulation governing overtime pay for federal employees have existed for eighty years.

### A. Statutory Scheme

On June 30, 1945, Congress enacted the Federal Employees Pay Act of 1945 (FEPA or the Act) to "improve

---

[1]    Circuit Judge Newman did not participate.

salary and wage administration in the Federal service" and "to provide pay for overtime." Pub. L. No. 79-106, 59 Stat. 295 (1945). Included in FEPA was § 201, which provided for overtime compensation:

> Officers and employees to whom this title applies shall, in addition to their basic compensation, be compensated for all hours of employment, *officially ordered or approved*, in excess of forty hours in any administrative workweek . . . .

*Id.* at 296 (emphasis added).[2] In 1954, Congress amended § 201 but made no relevant changes to the "officially ordered or approved" language. Pub. L. No. 83-763, 68 Stat. 1109 (1954). In 1966, Congress recodified Title 5 but again made no relevant changes to the "officially ordered or approved" language. Pub. L. No. 89-554, 80 Stat. 485 (1966). The present statutory language, now codified at 5 U.S.C. § 5542(a), has undergone additional amendments since recodification in 1966 but, as relevant to this appeal, it contains the same operative language as the originally enacted statute:

> [H]ours of work *officially ordered or approved* in excess of 40 hours in an administrative workweek, or . . . in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for . . . .

5 U.S.C. § 5542(a) (hereafter, overtime statute).

In addition to providing overtime compensation, FEPA expressly delegated rulemaking authority to administer the Act to the Civil Service Commission:

> The Civil Service Commission is hereby authorized to issue such regulations, subject to the approval of

---

[2]   Unless otherwise noted hereafter, emphases are added.

the President, as may be *necessary for the administration* of the foregoing provisions of this Act . . . .

Pub. L. No. 79-106, § 605, 59 Stat. 304 (1945). Although Congress has amended this statute since it was enacted—including by changing "may be necessary" to "necessary" and substituting "Office of Personal Management" for "Civil Service Commission"—the current version of the statute delegates with similar language:

> The Office of Personnel Management may prescribe regulations, subject to the approval of the President, *necessary for the administration* of this subchapter . . . .

5 U.S.C. § 5548(a) (hereafter, delegation statute).

### B. Regulatory Scheme

On July 4, 1945—four days after Congress enacted FEPA—the Civil Service Commission promulgated regulations, approved by the President, to implement the Act. Regulations under the Federal Employees Pay Act of 1945, 10 Fed. Reg. 8191 (July 4, 1945). Among the initial regulations was § 401(c), which included an overtime writing requirement:

> No overtime in excess of the administrative workweek shall be *ordered or approved except in writing* by an officer or employee to whom such authority has been specifically delegated by the head of the department or independent establishment or agency, or Government-owned or controlled corporation.

*Id.* at 8194.

In 1968, the Civil Service Commission revised the regulations implementing FEPA to conform to the recodification of Title 5 but made "no substantive changes in the regulations." Revision of Regulations, 33 Fed. Reg. 12402 (Sept. 4, 1968). The present regulatory language

implementing the writing requirement, now codified at 5 C.F.R. § 550.111(c), has undergone additional amendments since recodification but, as relevant to this appeal, it contains the same operative language as the originally promulgated regulation:

> Overtime work in excess of any included in a regularly scheduled administrative workweek may be *ordered or approved only in writing* by an officer or employee to whom this authority has been specifically delegated.

5 C.F.R. § 550.111(c) (hereafter, overtime regulation).

### C. Case Law

For the first decade after FEPA was enacted, the Court of Claims—one of our predecessor courts whose decisions bind this court's panels—enforced the writing requirement in the overtime regulation. *See, e.g.*, *Gaines v. United States*, 132 Ct. Cl. 408, 412–13 (1955) ("[A]ny claim must be based upon the performance of overtime services which were expressly authorized or approved in writing by an officer or employee to whom such authority has been specifically delegated."). That changed in *Anderson v. United States*, 136 Ct. Cl. 365 (1956), when the en banc Court of Claims interpreted "officially ordered or approved" in the overtime statute as including induced overtime and not requiring a writing. 136 Ct. Cl. at 368–71. For the next forty years, the Court of Claims and its successor courts applied *Anderson*'s holdings. *See, e.g.*, *Adams v. United States*, 162 Ct. Cl. 766, 768–69 (1963); *Baylor v. United States*, 198 Ct. Cl. 331, 359–60 (1972); *DeCosta v. United States*, 22 Cl. Ct. 165, 176 (1990), *aff'd on other grounds*, 987 F.2d 1556 (Fed. Cir. 1993).

In *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004), this court first addressed the overtime statute and regulation. We held "the *Anderson* line of cases is no longer good law" in light of intervening Supreme Court precedent. *Doe*,

372 F.3d at 1354–57 (holding that, after *Schweiker v. Hansen*, 450 U.S. 785 (1981), "the written order requirement is not invalid on the ground that it imposes a procedural requirement that limits the right to overtime compensation under the statute"). Having concluded the writing requirement was not invalid, we then held the overtime regulation was entitled to *Chevron* deference and upheld it. *Id.* at 1358–63.

In *Mercier v. United States*, 786 F.3d 971 (Fed. Cir. 2015), this court again interpreted "officially ordered or approved" overtime, albeit in a different statute that had no corresponding regulation. 786 F.3d at 972 ("This case turns on the interpretation of the words 'officially ordered or approved' in 38 U.S.C. § 7453(e)(1), the statute which provides overtime pay for nurses employed by the Department of Veterans Affairs."). We held *Doe* could not overrule *Anderson*'s interpretation of "officially ordered or approved" in FEPA as allowing for induced overtime. *Id.* at 980–82. We further held "officially ordered or approved" overtime in 38 U.S.C. § 7453(e)(1) should have the same meaning as "officially ordered or approved" overtime in the overtime statute, which includes induced overtime per *Anderson. Id.* at 982.

Against this backdrop, Ms. Lesko filed her appeal.

## II. Procedural Background

Ms. Lesko worked as a registered nurse for the Indian Health Service (IHS) for eight months during the COVID-19 pandemic. J.A. 2.[3] During this time, she alleges nurses "were stretched to their limits" and "[s]upervisors and managers regularly and routinely required nurses to stay after hours and work without compensation to meet the patient demands." J.A. 82 ¶ 42. After resigning from IHS,

---

[3] "J.A." refers to the parties' Joint Appendix filed at ECF No. 22.

Ms. Lesko filed a complaint for a class action suit, which she amended after the Government moved to dismiss it. J.A. 3. The Amended Complaint includes five counts and alleges Ms. Lesko and all other similarly situated registered nurses employed by IHS were denied pay enhancements in violation of various statutes and regulations. J.A. 91–99 ¶¶ 73–115. In Count II, Ms. Lesko alleges the Government violated the overtime statute by failing to pay registered nurses for overtime induced by their supervisors. *Id.* at 93–95 ¶¶ 81–91. The Government moved to dismiss all counts for failure to state a claim. J.A. 145–65. The Government argued dismissal was warranted, in part, because Ms. Lesko did not allege she or any potential class members had written authorization for overtime as required by the overtime regulation. *Id.* at 156–60. The Court of Federal Claims granted the motion and dismissed all counts. J.A. 1–9. Ms. Lesko appeals.

A panel of this court heard oral argument on October 9, 2024. On March 18, 2025, we sua sponte granted en banc hearing and ordered briefing and argument limited to the following issues:

a. Considering *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), how should "officially ordered or approved" in 5 U.S.C. § 5542(a) be interpreted?

b. Is this a case in which "the agency is authorized to exercise a degree of discretion" such that OPM has authority to adopt its writing requirement? *Loper*, 603 U.S. at 394.

c. Is there a statutory provision (e.g., 5 U.S.C. §§ 1104, 5548) that provides such authority?

*Lesko v. United States*, 130 F.4th 1385, 1385–86 (Fed. Cir. 2025).[4]  We heard argument on September 12, 2025.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

### DISCUSSION

The Government argues we should affirm the dismissal of Count II because the writing requirement in the overtime regulation reflects a valid exercise of OPM's congressionally delegated rulemaking authority.  We agree.

We review de novo the Court of Federal Claims' dismissal of a complaint for failure to state a claim upon which relief may be granted.  *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1328 (Fed. Cir. 2012).  Statutory interpretation is a question of law we review de novo.  *Bartels Tr. ex rel. Cornell Univ. v. United States*, 617 F.3d 1357, 1359 (Fed. Cir. 2010).

"[C]ourts must exercise independent judgment in determining the meaning of statutory provisions" and may not defer to agency interpretations of ambiguous statutes.  *Loper Bright*, 603 U.S. at 394, 413.  The best reading of a statute, however, "may well be that the agency is authorized to exercise a degree of discretion."  *Id.* at 394.  The Supreme Court in *Loper Bright* provided examples of statutes that delegate discretionary authority to agencies: (1) statutes that expressly delegate to an agency the authority to define statutory terms, (2) statutes that empower an agency to prescribe rules to "fill up the details" of a statutory scheme, and (3) statutes that provide agencies with "flexibility" to regulate.  *Id.* at 394–95.  When a reviewing court concludes the best reading of a statute is that it delegates discretionary authority to an agency, the court should uphold the regulation if the delegation is

---

[4]  In addition to the parties' briefs, we received one amicus brief from the Chamber of Commerce of the United States of America.  Dkt. 70.

constitutional, and the agency engaged in "reasoned decisionmaking" within the boundaries of its delegated authority.  *Id.* at 395 (citation omitted).

### I.  Construction of "officially ordered or approved"

We begin our analysis with the overtime statute, which obligates the Government to pay for overtime "officially ordered or approved."  5 U.S.C. § 5542(a).  FEPA does not specify what this phrase means, nor does it expressly delegate to OPM the authority to define this phrase.  And the statutory text surrounding the phrase does not specify whether overtime "officially ordered or approved" must be in writing or how it should otherwise be done.  We therefore look to the plain meaning of "officially ordered or approved."

The ordinary meaning of "order"[5] is to command or direct, while the ordinary meaning of "approve"[6] is to confirm

---

[5]  *Webster's New International Dictionary* 1716 (2d ed. 1939) (defining "order" as "direct" and "to command"); *Black's Law Dictionary* 1298 (3d ed. 1933) (defining "order" as "a command or direction authoritatively given"); *Webster's Third New International Dictionary* 1588 (2002) (defining "order" as "to issue commands"); *Black's Law Dictionary* 1319 (12 ed. 2024) (defining "order" as "[a] command, direction, or instruction").

[6]  *Webster's New International Dictionary* 133 (2d ed. 1939) (defining "approve" as "[t]o sanction officially; to ratify; confirm"); *Black's Law Dictionary* 131 (3d ed. 1933) (defining "approve" as "[t]o confirm, ratify, sanction, or consent to some act or thing done by another"); *Webster's Third New International Dictionary* 106 (2002) (defining "approve" as "to express often formal[] agreement with and support of or commendation of as meeting a standard"); *Black's Law Dictionary* 126 (12 ed. 2024) (defining

or ratify. Both terms connote that someone with authority gives the order or approval, as confirmed by dictionaries ranging from the time FEPA was enacted in 1945 until the present day. Regarding the form required for a valid order or approval, we agree with the panel in *Doe* that these words, standing alone, can encompass written form, oral form, or both. 372 F.3d at 1358–59. The overtime statute does not specify the required form. The statute's only guidance on this issue derives from the word "officially," which functions as an adverb describing both "ordered" and "approved."

"Officially"[7] means having proper authorization, which includes both the person providing authorization and the necessary formality (i.e., the form) needed for authorization. "Officially ordered or approved" overtime is thus overtime commanded or ratified with proper authorization.[8]

---

"approve" as "[t]o give formal sanction to; to confirm authoritatively").

[7] *Webster's Third New International Dictionary* 1567 (2002) (defining "officially" as "with official authorization: formally" (capitalization normalized); defining "official" as "prescribed or recognized as authorized" and "a person authorized to act for a government"); *Funk & Wagnalls New Standard Dictionary of the English Language* 1714 (1940) (defining "officially" as "[b]y the proper officer; formally or properly"); *Black's Law Dictionary* 1306 (12th ed. 2024) (defining "official" as "[a]uthorized or approved by a proper authority"); *New Oxford American Dictionary* 1217 (3d ed. 2010) (defining "official" as "properly authorized"; defining "officially" as "in a formal and public way").

[8] Given that an order must occur before the act that is being ordered, an order to work overtime occurs before the employee works overtime. In contrast, because an approval confirms or ratifies some act or request, an approval

The plain language of this phrase presupposes a process for authorizing overtime with sufficient formalities but provides no guidance as to the mechanics of that process (i.e., who can authorize overtime and how they can do it (oral, written, or both)). *See* Oral Arg. 5:58–6:13 (Ms. Lesko agreeing the overtime statute does not specify the mechanics of the authorization process). Accordingly, the best interpretation of the overtime statute is that Congress mandated an authorization process for directing or ratifying overtime but did not determine the requisite formalities in the statutory text. To the extent the Government has argued that the plain language of the statute requires that such overtime orders or approvals must be in writing, we do not agree; nor do we give any deference to the agency interpretation of the language of the statute. We conclude that Congress contemplated formalities when it required overtime to be "officially ordered or approved," but was silent as to the requisite formalities.

## II. Delegation to OPM

While the overtime statute is silent as to the formalities required to officially order or approve overtime, FEPA is not silent about *who* Congress intended to fill in those details. Congress delegated rulemaking authority to OPM to "prescribe regulations, subject to the approval of the President, *necessary for the administration* of this subchapter." 5 U.S.C. § 5548(a). Given the overtime statute is in the same subchapter as this delegation, we conclude that Congress expressly delegated rulemaking authority to

---

to work overtime can occur before, during, or after the employee works overtime.

OPM to prescribe regulations necessary for administering the overtime statute, subject to approval by the President.[9]

## A.  Discretionary Delegation

This delegation falls within the type of delegations that provide agencies discretion to regulate.  *Loper Bright*, 603 U.S. at 394–95.  The delegation is a fill-up-the-details delegation, *id.* at 395, because the overtime statute is silent regarding the formalities required for overtime to be "officially ordered or approved," despite the plain meaning of the phrase requiring such formalities.  Congress's silence on this issue, in combination with its delegation of authority to OPM to prescribe regulations necessary for administering the overtime statute, clears the path for OPM to fill up the details of the authorization process.

The delegation is also a flexible delegation.  In *Loper Bright*, the Supreme Court cited a statute that directs the Environmental Protection Agency (EPA) to regulate power plants "if the Administrator finds such regulation is appropriate and *necessary*" as an example of a type of flexible delegation.  603 U.S. at 395 n.6 (quoting 42 U.S.C. § 7412(n)(1)(A)).  Like the EPA statute, the delegation statute provides OPM flexibility to regulate as "necessary" for administering the overtime statute.  *Compare* 5 U.S.C. § 5548(a), *with* 42 U.S.C. § 7412(n)(1)(A).  The delegation in this statute is of the type enumerated in *Loper Bright* that gives agencies discretionary authority to regulate.  We conclude that under these circumstances, OPM has the

---

[9]   President Harry S. Truman approved the writing requirement, which the parties do not dispute has remained unchanged since the original overtime regulation was promulgated.  Regulations under the Federal Employees Pay Act of 1945, 10 Fed. Reg. 8191–96 (July 4, 1945).

discretionary authority to determine the formalities required to administer the authorization process for overtime.

### B. Necessity of the Writing Requirement

Because OPM has discretionary authority to regulate the authorization process for overtime, OPM has the authority to require that such orders or approvals be in writing so long as it is necessary for administering the overtime statute. Based on the plain language of the overtime statute and the practical considerations enumerated by the Government, we conclude the writing requirement meets this necessary-for-administration requirement.

Congress required overtime be "officially" ordered or approved. In order to administer the overtime statute, OPM must determine the mechanics of the authorization process; it could not administer the statute otherwise. Congress did define, in the statute itself, the timing when overtime can be ordered (prospective) or approved (prospective, concurrent, or retrospective). But it did not define who can authorize overtime or how overtime can be authorized. Ms. Lesko admits the statute is silent regarding who can order or approve overtime and that therefore OPM has the authority to determine who can authorize overtime. Oral Arg. 1:13–40, 4:43–5:15, 5:57–6:23, 6:46–7:10, 8:05–8:25, 14:06–14:17, 19:47–20:14, 21:21–21:48. Ms. Lesko also admits OPM has the authority to require employees to submit timecards to be entitled to overtime, which goes to the issue of how overtime can be authorized. Oral Arg. 1:00:28–1:01:02. There is little reason to preclude OPM from also determining the form of authorized overtime, which likewise addresses how overtime can be authorized. If we allowed OPM to determine the *who* but not certain aspects of the *how*, we would be arbitrarily parsing the authority delegated to OPM based on a distinction the overtime and delegation statutes never draw.

Ms. Lesko argues the writing requirement is not necessary because there is no evidence the Government was unable to administer overtime pay without an enforceable writing requirement for the forty-eight years between *Anderson* and *Doe*. Lesko Br. 33–34. In response, the Government argues *Anderson*'s amorphous "inducement" standard was problematic for administering the overtime statute. Gov. Br. 50–51. The Government also argues the writing requirement is necessary because it (1) controls the Government's liability for overtime by limiting unexpected liabilities that may arise when an employee claims, after the fact, she was entitled to overtime; (2) provides evidence overtime was actually authorized, which reduces the likelihood of overtime disputes; (3) makes overtime easier to track for agencies, which promotes fiscal responsibility and accountability; (4) reduces conflicts over whether overtime is officially ordered or approved; and (5) provides employees with clear notice, often in advance of working overtime, that the overtime is officially ordered or approved. Gov. Br. 46–51; Oral Arg. 42:20–43:11.

Ms. Lesko does not meaningfully dispute the Government's claims as to the practical necessity of the writing requirement. Instead, she claims that, because the Government functioned in the past without an enforceable writing requirement, this shows a writing requirement is not necessary today. This fails to account for the fact that OPM and federal employees have relied on the writing requirement for the past twenty years to the benefit of both parties. This also ignores the problem in *Anderson*'s amorphous "inducement" standard. In describing the difficulty of applying the correct inducement standard, the trial court in *Doe* explained that this "court has taken almost every conceivable position with regard to overtime. Consequently, an employee seeking overtime can likely find an opinion of this court that fits his situation regardless of what it may be." *Doe v. United States*, 54 Fed. Cl. 404, 410 (2002) (quoting *Anderson v. United States*, 201 Ct. Cl. 660,

675 (1973) (Skelton, J., dissenting)).  As shown by *Anderson*'s progeny of inducement cases, many disputes have arisen over whether the Government properly administered overtime pay.  *See, e.g.*, *Gray v. United States*, 136 Ct. Cl. 312, 313 (1956); *Adams*, 162 Ct. Cl. at 781; *Albright v. United States*, 161 Ct. Cl. 356, 361 (1963); *Rapp v. United States*, 340 F.2d 635, 641 (Ct. Cl. 1964); *Fix v. United States*, 368 F.2d 609, 613 (Ct. Cl. 1966); *Baylor*, 198 Ct. Cl. at 359–60; *Manning v. United States*, 10 Cl. Ct. 651, 663 (1986); *DeCosta*, 22 Cl. Ct. at 176–77; *Hannon v. United States*, 29 Fed. Cl. 142, 149 (1993).

Ms. Lesko also argues the writing requirement improperly restricts a statutory right for the sake of "budgetary concerns" and "administrative ease."  Lesko Reply Br. 23–24.  Again, Ms. Lesko fails to meaningfully engage with the Government's specific reasons why the writing requirement is necessary.  The writing requirement creates clarity for both the Government and the employees regarding when overtime will be compensated.  It reduces the likelihood of overtime disputes, limits unexpected liabilities, and creates evidence substantiating that the hours worked were actually hours required by the Government.  The Government justified the necessity of the writing requirement, and Ms. Lesko has not meaningfully disputed the Government's arguments regarding necessity.

We hold the best interpretation of the overtime and delegation statutes is that Congress delegated to OPM the discretionary authority to promulgate the writing requirement.[10]  There is no statutory right to induced

---

[10]   In a separate provision, Congress imposed a writing requirement for waivers of compensatory time off applicable to border patrol agents who work more than 10 extra hours in a 14-day period.  5 U.S.C. § 5542(g)(4)(B).  Since § 5542(g)(4)(B) expressly dictates the form of a valid

16                                                          LESKO v. US

overtime, only officially ordered or approved overtime that is properly authorized. And the delegation statute provides discretionary authority to OPM to determine what constitutes proper authorization.

### III.  Propriety of the Writing Requirement

Having concluded the overtime and delegation statutes are properly interpreted to delegate to OPM discretionary authority to determine the form an order or approval must take to be properly authorized, we evaluate whether the delegation was constitutional and whether OPM engaged in reasoned decision making within the boundaries of its delegated authority. *Loper Bright*, 603 U.S. at 395.

### A.  Constitutionality

Ms. Lesko argues any delegation allowing OPM to promulgate the writing requirement is unconstitutional under the non-delegation doctrine because it allows OPM to restrict the scope of a substantive right under the overtime statute. Lesko Br. 35–37. We do not agree.

The writing requirement does not restrict the scope of a substantive right because there is no right to overtime that is not officially authorized. *See supra Discussion* § I. While the overtime statute is silent as to the form "officially ordered or approved" overtime must take to be properly

---

waiver, there is no discretion for OPM to decide the form. In contrast, § 5542(a) presupposes a process with formality for proper authorization of overtime, but Congress provided no guidance as to proper formalities and delegated authority to OPM to adopt the requirements necessary for administration, subject to presidential approval. Under these circumstances, we do not agree that the writing requirement in § 5542(g)(4)(B) should be understood as Congress's silent preclusion of OPM's writing requirement for § 5542(a).

authorized, Congress delegated authority to OPM to determine the proper form, which OPM did. *See supra Discussion* § II. The fact that Ms. Lesko disagrees with the form specified by OPM does not mean the writing requirement contradicts the overtime statute. It also does not mean OPM interpreted the overtime statute as mandating a writing requirement. Instead, OPM prescribed a rule necessary to implement the overtime statute on an issue FEPA gave OPM discretion to address.

There also is nothing unusual about the authority delegated to OPM in this case. Congress regularly delegates authority to agencies to prescribe regulations "necessary" to implement a statutory scheme.[11] And agencies regularly prescribe writing requirements.[12] Moreover, there is an

---

[11]    *See, e.g.*, 38 U.S.C. § 501(a) ("The Secretary [of the Department of Veterans Affairs] has authority to prescribe all rules and regulations which are *necessary* or appropriate to carry out the laws administered by the Department . . . ."); 42 U.S.C. § 7601(a)(1) ("The Administrator [of the Environmental Protection Agency] is authorized to prescribe such regulations as are *necessary* to carry out his functions under this chapter."); 26 U.S.C. § 7805(a) ("[T]he Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be *necessary* . . . ."); 47 U.S.C. § 154(i) ("The [Federal Communications] Commission may . . . make such rules and regulations . . . as may be *necessary* in the execution of its functions."); 16 U.S.C. § 825h ("The [Federal Energy Regulatory] Commission shall have power . . . to prescribe, issue, make, amend, and rescind . . . regulations as it may find *necessary* or appropriate to carry out the provisions of this chapter.").

[12]    *See, e.g.*, 30 C.F.R. § 20.5(f) ("No verbal report of approval or disapproval will be made to the applicant.

intelligible principle in the delegation statute that authorizes OPM to promulgate the writing requirement—OPM may only prescribe regulations necessary to implement the overtime statute. *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) ("To distinguish between the permissible and the impermissible [delegation], we have long asked whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do."). We therefore conclude the delegation of authority to OPM to promulgate the writing requirement is constitutional.

## B. Reasoned Decision Making

Ms. Lesko also argues the overtime regulation's writing requirement is not the product of reasoned decision making because it contradicts the overtime statute's plain language. Lesko Br. 37–44. For the reasons explained above, we do not agree. *See supra Discussion* §§ I–II, III.A. The plain language is silent as to the proper form "officially ordered or approved" overtime must take to be properly authorized. And the delegation statute provides OPM with discretion to determine the proper formalities. The writing requirement therefore does not contradict the overtime statute.

Because the best reading of the overtime statute is that Congress constitutionally delegated authority to OPM to prescribe the writing requirement, which OPM promulgated based on reasoned decision making within the

---

Approval will be made *only in writing* by [the Mine Safety and Health Administration]."); 36 C.F.R. § 67.3(b)(5) ("Approval of applications and amendments to applications is conveyed *only in writing* by duly authorized officials of the [National Park Service] acting on behalf of the Secretary."); 18 C.F.R. § 35.32(a)(2) ("The utility may provide overall investment policy to the Trustee or Investment Manager, but it may do so *only in writing . . . .*").

boundaries of its delegated authority, we uphold the overtime regulation. While we are sympathetic to Ms. Lesko and others similarly situated, we note two important aspects of this opinion that will help federal employees moving forward: (1) employees now know that overtime must be authorized in writing and can demand written authorization prior to working overtime, and (2) supervisors, under appropriate circumstances, can retroactively approve overtime that was orally ordered by ratifying the overtime in writing. For example, the Department of Health and Human Services Personnel Instruction No. 550–1 requires that the overtime be "authorized both in advance and in writing," but provides that "[i]n emergencies, employees may be ordered to work overtime without prior approval, provided approval is documented the next workday." DEP'T OF HEALTH & HUM. SERVS., HUMAN RESOURCES MANUAL, PERS. INSTR. NO. 550-1-50 at 7 (revised Nov. 3, 2010), https://www.hhs.gov/sites/default/files/hr-resource-library-550-1.pdf (last accessed Nov. 14, 2025).

## CONCLUSION

We have considered Ms. Lesko's remaining arguments and find them unpersuasive. For the foregoing reasons, we hold the writing requirement is valid and affirm the Court of Federal Claims' dismissal of Count II. We refer the remainder of the appeal concerning Counts I and III–V back to the panel for resolution.

## **AFFIRMED**

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**JILLIAN LESKO,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1823

---

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00715-CNL, Judge Carolyn N. Lerner.

---

STOLL, *Circuit Judge*, dissenting, with whom *Circuit Judges* REYNA, CUNNINGHAM, and STARK join.

There is no dispute that the plain meaning of "officially ordered or approved" in the overtime statute is not limited to written orders or approvals. Majority Op. 11. Nonetheless, the majority determines that, between the term "officially ordered or approved" in 5 U.S.C. § 5542(a) and the grant of authority to OPM to "prescribe regulations[] . . . necessary for the administration of this subchapter" in 5 U.S.C. § 5548(a), Congress delegated to OPM "discretionary authority to determine the formalities required to administer the authorization process for overtime." Majority Op. 12–13. We see no such delegation in the statutory language. Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), we would hold that the best meaning

of the statutory phrase "hours of work officially ordered or approved in excess of 40 hours in an administrative workweek" does not require a writing.

I

As the Supreme Court has explained, it is the responsibility of the court "to independently interpret the statute and effectuate the will of Congress." *Loper Bright*, 603 U.S. at 395; *see also id.* at 400. "[A]mbiguity is not a delegation to anybody," and courts must "use every tool at their disposal to determine the best reading of the statute." *Id.* at 400. Applying these principles to the overtime statute reveals there is a best meaning for the statutory language "officially ordered or approved": it includes orders or approvals for overtime that are not put in writing.

First, Congress knows how to prescribe a writing requirement when it wishes to do so. We presume Congress means what it says. *See Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.,* 108 F.4th 1376, 1382 (Fed. Cir. 2024) ("We assume Congress means what it says and says what it means."). We further presume Congress does not mean what it does not say.

Indeed, Congress included "must be approved in writing" in another subsection of the very statute at issue in this case—§ 5542(g)(4)(B). This provision pertains to compensatory time off earned by Customs and Border Protection agents for time spent performing overtime work when that overtime work is not ordered or approved in advance of the workweek:

U.S. Customs and Border Protection may, as it determines appropriate, waive the limitation under subparagraph (A) for an individual border patrol agent for hours of irregular or occasional overtime work, but such waiver must be approved *in writing* in advance of the performance of any such work for which compensatory time off is earned under

paragraph (1)(B)(ii), (2)(B)(ii), or (3)(B)(ii). If a waiver request by a border patrol agent is denied, the border patrol agent may not be ordered to perform the associated overtime work.

5 U.S.C. § 5542(g)(4)(B) (emphasis added). If Congress wanted to include a writing requirement for overtime "officially ordered or approved" in § 5542(a), it would have expressly said so, just as it did in § 5542(g)(4)(B); that § 5542(a) lacks such language is telling. Because Congress directly included a writing requirement for another aspect of the overtime regime for specific Title 5 employees, but did not do so in the general provision for overtime at issue here, we should not assume Congress intended to allow OPM to impose a writing requirement. In fact, Congress's choice strongly supports the opposite conclusion: that it did not intend for a writing requirement in order for overtime to be "officially ordered or approved," since if Congress did so intend it could have—and would have—said so. If a writing requirement were truly "necessary for the administration" of the overtime statute, one would expect Congress to have written that requirement into § 5542(a), just as it did in § 5542(g)(4)(B).

While the majority discounts the use of "in writing" in § 5542(g)(4)(B), *see* Majority Op. 15–16 n.10, we routinely treat Congress's uses of different words to mean different things. *See Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*, 122 F.4th 1339, 1345 (Fed. Cir. 2024) ("We understand this difference [in language] to mean Congress in fact intended two different things."). Indeed, that Congress chose not to say "in writing" in the general provision for overtime yet did include "in writing" in another subsection of the same statute undermines not only the majority's conclusion that Congress delegated such authority to OPM, but also undermines the majority's conclusion that a writing requirement is "necessary for the administration of th[e] subchapter." *See* Majority Op. 11–16. "When Congress includes particular language in one section of a

statute but omits it in another section of the same Act, we generally take the choice to be deliberate." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022) (cleaned up) (citation omitted).

Second, interpreting the best meaning of "officially ordered or approved" to include more than just orders or approvals that are made in writing accords with our court's current interpretation of the same language—"officially ordered or approved"—in 38 U.S.C. § 7453(e)(1), which authorizes overtime pay for VA nurses. In *Mercier v. United States*, 786 F.3d 971 (Fed. Cir. 2015), we held that this same precise statutory language allows for an induced theory of overtime and does not limit overtime work to that authorized in writing. When Congress uses the exact same statutory language—"officially ordered or approved"—in similar contexts, authorizing overtime pay for various executive branch employees, we should interpret the statutes consistently, as we assume Congress intends the same meaning by using the same words. *See United States v. Davis*, 588 U.S. 445, 458 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning.").

## II

While the majority agrees that the plain text of § 5542(a) does not require a writing to order or approve overtime, it concludes that Congress in § 5548(a) delegated to OPM authority to interpret "officially ordered or approved" in a manner that does impose a writing requirement. The majority finds such a delegation in the statutory authorization given to OPM to prescribe regulations "necessary for the administration of this subchapter." Majority Op. 11–12. We disagree and would conclude that there is no delegation to the agency to change the plain meaning of "officially ordered or approved" under *Loper Bright*.

*Loper Bright* commands courts to exercise their independent judgment in interpreting statutes but also

acknowledges that some potential deference to an agency's interpretation remains when, under the statute, "the agency is authorized to exercise a degree of discretion." 603 U.S. at 394. *Loper Bright* provides three exemplary categories of such congressional delegation to an agency: (1) "statutes [that] 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term," *id.* at 394–95 (second alteration in original) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)); (2) "[o]thers [that] empower an agency to prescribe rules to 'fill up the details' of a statutory scheme," *id.* at 395 (quoting *Wayman v. Southard*, 23 U.S. 1, 43 (1825)); and (3) still others that allow agencies "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,'" *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). A court, however, is to keep in mind that, even if it determines such delegation occurred, it is still the court's role "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up) (citation omitted).

According to the majority, Congress's use of "officially ordered or approved" in § 5542(a) and "necessary for the administration" in § 5548(a) reveals that Congress left OPM to fill up the details of the statutory scheme and, hence, provides the agency flexibility to impose a writing requirement. *See* Majority Op. 11–12. But such purported delegation is not clear or direct, especially in comparison to the exemplary delegations identified in *Loper Bright*.

## A

The majority first relies on the second type of delegation identified in *Loper Bright*: filling up the details of a statutory scheme. The majority concludes that because

(1) the plain meaning of the phrase "officially ordered or approved" requires "formalities," (2) "the overtime statute is silent regarding the formalities required for overtime," and (3) § 5548(a) authorizes "OPM to prescribe regulations necessary for administering the overtime statute," Congress intended "for OPM to fill up the details of the authorization process"—i.e., to have discretion in defining what "officially ordered or approved" requires. Majority Op. 12. We disagree.

Neither the language of § 5542(a) nor of § 5548(a) is like the exemplary statute *Loper Bright* cites for filling up the details. *Loper Bright* identifies the following statutory language as "empower[ing] an agency to prescribe rules to 'fill up the details' of a statutory scheme," 603 U.S. at 395 (citation omitted): "[w]henever, in the judgment of the Administrator . . . , discharges of pollutants from a point source . . . would interfere with the attainment or maintenance of that water quality . . . , effluent limitations . . . shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality." 33 U.S.C. § 1312(a); *see Loper Bright*, 603 U.S. at 395 n.6 (quoting 33 U.S.C. § 1312(a)). There are meaningful differences between this example and what the majority relies on as the purported delegation to OPM. Unlike the clear and direct delegation Congress laid out in 33 U.S.C. § 1312(a) between "the judgment of the Administrator" and the effluent limitations he is to create to maintain water quality, there is no clear or direct connection drawn between the general provision authorizing OPM to administer the statute in § 5548(a) and the phrase at issue ("officially ordered or approved") in § 5542(a).[1]

---

[1]    In stark contrast to the general delegation in § 5548(a) relied on by the majority here, other portions of

Indeed, § 5548(a)—authorizing the agency to prescribe regulations "necessary for the administration of this subchapter"—does not refer back to § 5542 or to the phrase "officially ordered or approved." Nor does it give OPM discretion to define or interpret statutory terms. The

§ 5542 include language that clearly delegates to OPM discretion to make specified determinations about specified subject matter. *See* 5 U.S.C. § 5542(c) ("[T]he Office of Personnel Management *shall by regulation prescribe what hours shall be deemed to be hours of work and what hours of work shall be deemed to be overtime hours* for the purpose of such section 7 [of the Fair Labor Standards Act of 1938]." (emphasis added)); *id.* § 5542(h)(1)(B)(i) ("The Director of the Office of Personnel Management . . . *shall identify the situations in which a firefighter shall be deemed to have worked hours actually worked by a substituting firefighter* under a qualified trade-of-time arrangement." (emphasis added)); *id.* § 5542(h)(2)(A)(ii)(IV) (". . . in the case of an employee who is not subject to subchapter III of chapter 83 or chapter 84, holds a position that *the Office of Personnel Management determines would satisfy subclause (I), (II), or (III) . . .*" (emphasis added)). Other sections within the same subchapter also have language that explicitly delegates discretion to agency heads. *See, e.g.*, 5 U.S.C. § 5546a(a) (explaining that certain criteria an employee of the Federal Aviation Administration or the Department of Defense needs to meet to receive "premium pay at the rate of 5 per centum of the applicable rate of basic pay" include whether the employee's duties "are determined by the Administrator or the Secretary to be directly involved in or responsible for the operation and maintenance of the air traffic control system" and "are determined by the Administrator or the Secretary to be unusually taxing, physically or mentally, and to be critical to the advancement of aviation safety").

phrase "this subchapter" in § 5548(a) refers to "Subchapter V—Premium Pay," which contains over a dozen statutes and countless broad terms subject to multiple meanings, accompanied by congressional silence on which meaning to choose. Under *Loper Bright*, we could not reasonably read § 5548(a) as a congressional delegation allowing OPM to narrow every broad term in the subchapter merely based on OPM's say so that doing so is "necessary for the administration of th[e] subchapter."

Moreover, interpreting "officially ordered or approved" as a phrase that connotes unstated formalities and allows the agency to add a writing requirement as a formality "necessary for . . . administration" displaces congressional intent. We should not ignore the plain meaning of "officially ordered or approved"; nor may we latch onto the existence of general rulemaking authority (like that provided for by § 5548(a)) to defer to an agency's interpretation of statutory silence and ambiguities. *See generally SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 363 (2018) ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer."). *Loper Bright* makes clear that we lack a sufficient basis here to abandon our judicial role and fail to use all tools at our disposal and determine the best meaning of the statute.

B

The majority also relies on the third type of delegation identified in *Loper Bright*: authority to regulate pursuant to flexible terms. The majority concludes that the term "necessary" in the phrase OPM "may prescribe regulations[] . . . necessary for the administration of this subchapter" is similar to the example the Supreme Court provided in *Loper Bright* of a flexible term conferring discretionary regulatory authority on an agency. *See* Majority Op. 12. *Loper Bright* identifies the following as exemplary statutory language authorizing an agency "to regulate

subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable,'" 603 U.S. at 395 (citation omitted): "[t]he Administrator *shall regulate* electric utility steam generating units under this section, *if* the Administrator *finds such regulation is appropriate and necessary* after considering the results of the study required by this subparagraph." 42 U.S.C. § 7412(n)(1)(A) (emphases added); *see Loper Bright*, 603 U.S. at 395 n.6 (quoting 42 U.S.C. § 7412(n)(1)(A)); *see also id.* at 395 (citing *Michigan v. EPA*, 576 U.S. at 752).[2]

Again, *Loper Bright*'s exemplary delegation is significantly clearer and more direct than the purported delegation identified by the majority. The example specifically and narrowly defines what the agency may regulate and upon what grounds it may do so. Unlike the example, there is nothing in Title 5 that specifically says that OPM may or shall explicate and interpret "officially ordered or approved" if it finds such regulation necessary for overtime administration. Nor does § 5548(a) say that OPM can redefine or narrow the meaning of Congress's choice of statutory terms. While it is true that § 5548(a) allows OPM to "prescribe regulations[] . . . necessary for the administration of this subchapter," "officially ordered or approved" has a best meaning discernible by a court deploying its full interpretive toolkit, and Congress did not authorize OPM

---

[2] The majority emphasizes the word "necessary" in this statute to draw an analogy to the use the of word in § 5548(a), but review of the analysis in *Michigan v. EPA* shows the Supreme Court's focus on the word "appropriate." *See* 576 U.S. at 751–57. This accords with the Court's statement in *Loper Bright* that "a term or phrase that leaves agencies with flexibility" means terms like "appropriate or reasonable." 603 U.S. at 395 (quotation marks and citation omitted).

to change that best meaning for administrative convenience.  As *Loper Bright* explained, we should view a statute as delegating authority to define terms only where it is clear that "the best reading of [the] statute is that it delegates discretionary authority to an agency."   603 U.S. at 395.[3]  We see no such delegation for interpreting the meaning of "officially ordered or approved" here.   And whatever delegation there is to OPM to administer the statute, it still must fall within the "fix[ed] . . . boundaries of [the] delegated authority" by Congress to the agency.  *Id.* (second alteration in original) (citation omitted).  But as explained above, the best meaning of the statute does not limit orders or approvals to only those made in writing. Thus, any delegation that does exist must be within this boundary of congressional intent.

C

The majority does not rely on the first category of delegation described in *Loper Bright*: statutes that expressly delegate the authority to give meaning to a statutory term. We agree that such express delegation does not apply here. *Loper Bright* identifies three examples of statutory language that expressly delegates to an agency the authority to interpret a particular term:  (1) "has been deprived of parental support or care by reason of the unemployment (*as determined in accordance with standards prescribed by the Secretary*) of his father," *Batterton*, 432 U.S. at 418 n.2 (emphasis added) (citation omitted), (2) "to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (*as such terms*

---

[3]    It is unclear if a flexible term can grant an agency the power to define terms at all, as *Loper Bright* only approved such agency action where the "statute[] 'expressly delegate[s]' to an agency the authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 394 (citation omitted).

*are defined and delimited by regulations of the Secretary*),"
or (3) "contains a defect which could create a substantial
safety hazard, *as defined by regulations which the Commission shall promulgate*." *Loper Bright*, 603 U.S. at 394–95
& n.5 (first quoting 29 U.S.C. § 213(a)(15); and then quoting 42 U.S.C. § 5846(a)(2)). In each example, Congress's
statutory language identifies a particular term closely followed by language authorizing the agency to interpret that
term. These are narrow and direct delegations. No such
language is present in § 5542(a).

D

This is not to say that there is no delegation to the
agency in the congressional authorization to "prescribe regulations[] . . . necessary for the administration of th[e] subchapter." It is true that some administrative gaps need to
be filled; but the statute on its face allows orders or approvals that are not in writing. Allowing the agency to reinterpret the statute to hold otherwise goes beyond the
delegation to administer set forth in § 5548(a).

We do not agree with the majority's contention that the
writing requirement is simply a means of administering
§ 5542(a) by establishing how overtime can be authorized.
*See* Majority Op. 13. The writing requirement, instead,
clearly redefines the scope of the overtime liability Congress has authorized. Such a requirement therefore stands
far apart from others such as the timecard requirement
Ms. Lesko's counsel agreed at oral argument would be permissible. The fact that regulations governing the proof required to establish entitlement to a statutory grant may be
permissible does not mean that regulations redefining the
scope of a statutory entitlement are also permissible. *Cf.
Schweiker v. Hansen*, 450 U.S. 785 (1981) (finding a regulation merely procedural where it solely specified the manner in which one may invoke a right but did not
substantively redefine the right). Having determined that
the best meaning, and plain language, of the statutory

phrase "officially ordered or approved" encompasses orally ordered overtime, we may not permit OPM to "rewrite clear statutory terms to suit its own sense of how the statute should operate" by declaring those same hours non-overtime absent a writing. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Without a clear delegation of authority to interpret statutory terms, the judiciary is left to assess the reasonableness of the agency's policy rationales instead of using the proper statutory tools to interpret the meaning of "officially ordered or approved." *See* Majority Op. 14–15 (addressing "the practical necessity of the writing requirement"). But judging the reasonableness of policy is not the role of the judiciary. And while we do not discount the government's suggestion that OPM's writing regulation could further the goals of controlling costs and reducing disputes by creating a documentary record, we do not see how these goals override Congress's choice of language. For all we know, such language might well reflect other congressional goals, such as paying federal employees for overtime worked even if that overtime is ordered orally. And in a post-*Chevron* world, the agency's choice of language cannot override the best meaning of Congress's chosen language.[4]

---

[4]    Nor would we uphold the writing requirement on stare decisis principles. Indeed, our precedent is unclear. *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004), which attempted to overturn an earlier en banc decision rejecting a writing requirement, relied on *Chevron* deference to uphold OPM's regulation requiring a writing. *See* 372 F.3d at 1358–59. And then our later opinion in *Mercier* undermined *Doe*'s reasoning to revive the earlier en banc court's interpretation that overtime "officially ordered or approved" need not be reduced to a writing. *See Mercier*,

* * *

In sum, it is up to Congress, not OPM, to impose a writing requirement. Congress chose not to limit the statutory phrase "officially ordered or approved" to "in writing," despite imposing such a limit in another subsection of the same statute. Nor did Congress give OPM the authority to give meaning to "officially ordered or approved." That should be the end of the analysis. We should not "def[y] the command" emphasized in *Loper Bright* "that the reviewing court—not the agency whose action it reviews—is to decide all relevant questions of law and interpret . . . statutory provisions," and we should not "ignore . . . the reading th[is] court would have reached had it exercised its independent judgment." *Loper Bright*, 603 U.S. at 398–99 (first ellipsis in original) (quotation marks, emphasis, and citation omitted).

For the foregoing reasons, we respectfully dissent.

---

786 F.3d at 980–82. As we have two relatively recent opinions going in different directions on whether a writing requirement is valid, the principles of stare decisis do not apply. Nor would there be any undue surprise for the Government if we interpret the plain meaning of "officially ordered or approved" to encompass more than written orders or approvals, as our most recent decision in *Mercier* held exactly that. Accordingly, this case seems to set up an exemplary situation of when there is a "special justification," as contemplated in *Loper Bright*, for a court to review a prior agency interpretation approved under *Chevron*. *See* 603 U.S. at 412 (citation omitted).